# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2016

## STATE OF TENNESSEE v. MICAH ENGLAND

**Appeal from the Circuit Court for Madison County**
**No. 15-30     Donald H. Allen, Judge**

---

**No.  W2015-01804-CCA-R3-CD  -  Filed May 23, 2016**

---

The Defendant, Micah England, pleaded guilty in the Madison County Circuit Court pursuant to a negotiated plea agreement to carrying a weapon on school property, a Class E felony, with the length and the manner of service of the sentence to be determined by the trial court.  *See* T.C.A. § 39-17-1309 (2014) (amended 2015).  The court sentenced the Defendant to two years' probation.  On appeal, the Defendant contends that the trial court erred in denying his request for judicial diversion.  We affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Lloyd R. Tatum, Henderson, Tennessee, for the appellant, Micah England.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from a September 11, 2014 incident in which the Defendant carried three loaded handguns and a large knife onto a college campus.  The Defendant pleaded guilty to one count of carrying a weapon on school property.

At the guilty plea hearing, the Defendant stipulated to the following facts stated by the prosecutor:

September the 11th of last year, 2014, [the Defendant] was observed on campus at Jackson State Community College by a security officer . . . who noticed a large bulge under his shirt. As he approached, he noticed that that was a large knife. He then patted [the Defendant] down and found a handgun, loaded handgun on his person, as well as two more loaded handguns in his backpack that he had on him, as well as I believe there was a shotgun in his truck that he gave consent for officers to find and thus, the State would show at trial that on or about September the 11th, 2014, [the Defendant] did unlawfully carry with intent to go armed on a public campus, school campus, that it is a State school governed by the Board of Trustees here in the State of Tennessee. He did carry that gun, those guns and that knife, on that campus in violation of the law.

At the sentencing hearing, the Defendant testified that he was age twenty-three, that he had obtained a bachelor's degree, and that he had completed one semester of graduate-level coursework in ministry. He said that he was a Christian and that his goal upon graduating was "continuing serving the Lord and serving others." He stated that he had been on a number of mission trips, including Hurricane Katrina cleanup and nine trips to Haiti. He said that he had been a volunteer firefighter for about five years, that he did not have steady employment, and that he planned to attend graduate school full-time in the upcoming fall semester. He stated that he was an Eagle Scout, that he owned a house purchased with money he earned working as a security guard, and that he had moved to his parents' home because his house had been burglarized "too many" times.

The Defendant testified that he understood he had committed a serious and "very stupid" offense, that his intention was to ensure the well-being of others, and that he knew having weapons on campus was unlawful. He said that he did not leave his guns in his truck because they could have been stolen. He stated that he cooperated with the authorities in this case, that he was in good health, that he had resigned from his job as a security guard, and that he would have to resign from the fire department if he did not receive judicial diversion. He expressed remorse for his actions.

On cross-examination, the Defendant testified that on the date of the incident, he attended emergency medical technician (EMT) classes but that he no longer attended classes at Jackson State. He said that he remembered he had a shotgun in his truck while traveling to campus and that he did not want to be late for class. The Defendant stated that he was not concerned about the shotgun being stolen because it was more likely to be sold than used in a crime. He stated that he had handguns on his person because he was concerned about "[a]ny problem that might arise that might require force." He said that he had been taking EMT classes for three weeks and that he brought handguns to campus because the date was September 11 and "[s]chools are targets unfortunately." The Defendant stated that during his undergraduate education, he carried a gun in his truck

"legally as a non-student adult." He said that prior to these proceedings, he had a permit to carry a handgun. He stated that he knew it was unlawful to carry a gun on school property. He acknowledged that signs were posted on campus prohibiting guns and that he was not a member of law enforcement.

Upon examination by the trial court, the Defendant testified that he was attending an evening class, that he felt a need to carry three loaded guns because of his experience as a security guard at a college campus, and that he did not ask campus security if they needed additional help that day. The Defendant said that he acted out of concern for others and that carrying a gun was a poor decision. He stated that he "posed no more threat there than in anywhere else where always my concern is the well-being of others." He said that he was not aware of the third gun located in his backpack. He stated that he was a home amateur (HAM) radio operator and that he used the radio he had with him as a security guard, firefighter, and storm spotter. He said that he carried a HAM radio because he was always on call as a firefighter. He stated that he carried a large knife "for many practical purposes." The Defendant acknowledged that the guns he carried were concealed. He said that he owned three additional guns, one of which was not functional. On redirect examination, the Defendant stated that his additional guns were secured at his parents' home. He acknowledged that if he were denied judicial diversion, he would not be permitted to possess a gun.

Richard England, the Defendant's father, testified that he and his wife, the Defendant's mother, were professors at the Defendant's undergraduate institution. He said that the Defendant was adopted, had dyslexia and dysgraphia, and was homeschooled. Dr. England stated that the Defendant performed well in school and began college at age sixteen. Dr. England said that the Defendant might have been described as academically gifted, that the Defendant studied and read constantly, and that the Defendant had done very well in graduate school. Dr. England stated that the Defendant collected more than 8000 books to send to a Louisiana library after Hurricane Katrina as his Eagle Scout project. Dr. England confirmed that the Defendant had taken many mission trips to Haiti.

Dr. England testified that the Defendant had a "strong desire to help other people . . . particularly [in connection with] catastrophes," that the Defendant had worked with crowd control and security in Haiti, that the Defendant was a volunteer firefighter, and that the Defendant was assigned to campus security detail for important public figures who had visited the campus. Dr. England said that the Defendant had never engaged in violent behavior and that "while he has prepared himself, he has never been involved in any kind of altercation . . . other than verbal disputes[.]" Dr. England stated that he and the Defendant had discussed the incident and that Dr. England did not believe the trial court would see the Defendant again. Dr. England said his family had witnessed anti-American protests in foreign countries and had been placed "under alert [as] potential

targets for kidnapping" because Dr. England's son-in-law was a naval submarine officer. Dr. England stated that the Defendant worked in Haiti to protect children against human traffickers.

Dr. England testified that he and his wife had legal responsibility for their respective mothers and that the Defendant helped care for and ensured the safety of his grandmothers. Dr. England said that he believed the Defendant understood his conduct was wrong and would not repeat it. He stated that the Defendant had not touched a gun since the incident and that as a result of the incident, the Defendant decided to attend graduate school and redirect his life toward mission work.

Upon examination by the trial court, Dr. England testified that the Defendant worked as a security guard for a medical clinic in Haiti, that the Defendant did not carry a gun in Haiti, that some of the Defendant's guns were gifts from the Defendant's grandfather, that the Defendant had additional guns due to a previous interest in becoming a police officer, and that the Defendant carried guns in his truck in case he was needed as an armed security guard on campus. Dr. England said, though, that the Defendant did not carry a gun on his person as part of his security job and that the security director knew the Defendant kept a gun in his truck. Dr. England stated that the Defendant was concerned on September 11 about "what may happen or what could be a target, and he wanted to be of assistance . . . for the existing security." Dr. England said that he understood the reason campus security would have been concerned about finding a person with three loaded guns.

Dr. England testified that he was a member of a the board of trustees for a mental health institute, a member of the state medical ethics committee, and an on-call mental health provider for college students who "perhaps have some strong inclinations," and that he did not think the Defendant had mental health issues. Dr. England said that the Defendant underwent a mental health evaluation during the adoption process eighteen years previously and that the Defendant had been evaluated to determine his competency to stand trial.

Dr. England testified that the police department took possession of some of the Defendant's guns, that Dr. England had the remainder of the Defendant's guns locked in a closet, and that Dr. England had obtained a permit to carry a handgun.

The Defendant's mental health evaluation relative to his competency to stand trial for the present case was received as an exhibit. The evaluator deemed the Defendant competent to stand trial and noted the Defendant did not exhibit signs of drug or alcohol abuse.

Several individuals submitted letters of recommendation, which the trial court noted, and which were received as exhibits. The Defendant was described as hardworking, dependable, and committed to volunteer and mission work. Many of the people described the incident as a lapse in judgment but maintained the Defendant did not pose a threat to anyone.

Marcus Jones, a community corrections officer, testified that the Defendant tested negative for all illegal drugs in a drug screen ordered by the court. The court noted "grave concerns" related to the facts and circumstances of the case, ordered a psychological evaluation of the Defendant, and continued the sentencing hearing until the evaluation was complete.

When the sentencing hearing resumed, the psychological evaluation report was received as an exhibit. The report reflects that the Defendant received high scores on intelligence tests, including a high IQ score, and that he was within normal limits on all the tests. When discussing one test, the evaluator noted,

> [It] could be assumed that [the Defendant] possesses what's called 'hyper-vigilance' concerning stressful or critical situations in life. By his way of thinking, bad happenings are out there lurking, just ready to happen at any moment. Someone, and it is likely he has an internal feeling that it should be himself, should be alert . . . and should be ready to take the responsibility to help if something does happen.

The examiner noted she believed the Defendant "made a quick, inappropriate decision, not stopping to consider the consequences, when he took a weapon onto school property[,]" and that she did not think the Defendant was a threat to society.

The trial court noted that it had considered the principles of sentencing relative to judicial diversion, the nature and characteristics of the Defendant's conduct, the evidence and information offered by the parties, the Defendant's statement, and the Defendant's potential for rehabilitation and treatment.

Relative to the facts and circumstances in the case, the trial court recounted the facts of the case as set out in the guilty plea hearing. The judge noted that signs were posted prohibiting firearms on campus and that "I'm not sure exactly why [the Defendant] felt like it was going to be appropriate for him to violate the law by going on to this college campus with loaded handguns, with a large knife, and . . . a shotgun that was still in the car." The court found that the Defendant was a Range I offender.

Relative to the Defendant's amenability to correction, the trial court found that based upon the letters of recommendation and the information in the Defendant's

psychological and presentence reports, the Defendant was amenable to correction, and the court weighed the factor in the Defendant's favor. The court found that the circumstances of the offense weighed "very heavily" against granting diversion. The court noted the serious nature of the offense, especially given that it occurred on "a day that everyone understands [is a] concern for safety of citizens . . . [and] college students. I mean, there's just so many random acts of violence that are taking place across this country on September 11th and on other days as well." The judge stated,

> [We] have situations where people are being shot on college campuses [and] attacked in various theat[ers] and other public places . . . [and] it's hard to understand why the Defendant felt like it would be appropriate for him to go onto that college campus . . . carrying these loaded guns.
>
> Certainly he put himself [at] risk of being . . . suspected as a terrorist or . . . as someone who was going to cause harm to other students[.] . . . [T]hat's probably the worst decision he could have made.

The trial court found that the Defendant placed himself and other students at risk. The court found that the Defendant's lack of a criminal record and physical health weighed in his favor. The court found that the Defendant's social history and reputation as a nonviolent person weighed in his favor, but it found that his carrying three loaded guns on campus created a great potential for risk of injury. The court found that the Defendant's social history was a neutral factor in determining whether to grant judicial diversion.

Relative to the Defendant's mental health, the trial court noted its "great, great concerns . . . because this is an extremely bright individual . . . [who] scored very highly as far as his mental capacity." The court weighed the Defendant's mental health against judicial diversion because in spite of his intelligence, the Defendant's actions were "crazy" and "irresponsible." The trial court found that the need for deterrence weighed against granting judicial diversion, noting that it did not want repeated instances of this behavior because a person who carried a gun onto a college campus or in "any other type of public place is running a risk of potentially causing harm to other people."

The trial court found that granting diversion would not serve the interests of justice relative to the Defendant or members of the public. The court noted the Defendant's intentionally bringing the guns and the knife onto a college campus and the irresponsible nature of the Defendant's actions. The court found that the nature and circumstances of the offense "primarily" made granting diversion inappropriate.

The trial court found that the circumstances of the offense and the potential for harm to others were enhancement factors. The court noted that it gave "great

consideration" to the Defendant's mission work and good educational record and that his lack of criminal history and negative drug screen received "great weight" as mitigating factors.

The trial court stated its concern relative to why the Defendant had "guns of this nature[.]" The judge said, "[W]hy does somebody that's 23 years of age have a need to have multiple guns in their possession and why would someone like that want to carry multiple guns? . . . [It] concerns me because of the violent nature that guns can create under these circumstances." The court sentenced the Defendant as a Range I, standard offender to two years.

Relative to the manner of service, the trial court found that the Defendant had a potential for rehabilitation, noting the recommendation letters written on behalf of the Defendant, and ordered the Defendant serve his sentence on probation to be supervised by the community corrections program and contingent upon completion of any required mental health treatment.

## I. Denial of Judicial Diversion

The Defendant contends that the trial court erred in denying judicial diversion, arguing that the court clearly erred in weighing the Defendant's mental health and the Defendant's social history and that the court gave undue weight to the circumstances of the offense. The State responds that the court considered all of the appropriate factors and did not err in denying diversion. We agree with the State.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2013) (amended 2014). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326. "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or

lack thereof, is a permissible factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984).

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

In this case, the record reflects that the trial court named, considered, and articulated the weight it gave each *Electroplating* factor. We therefore review the court's decision for an abuse of discretion. The court weighed against the Defendant the circumstances of the offense, the Defendant's mental health, the deterrent value to the Defendant and others, and whether judicial diversion would serve the ends of justice. The court gave great weight to the circumstances of the offense, which it considered to be serious because of the risk the Defendant caused to himself and others, and the Defendant's mental health, which revealed that the Defendant, in spite of being extremely intelligent, made a calculated but irresponsible decision to bring multiple weapons onto a college campus.

The trial court weighed in the Defendant's favor the Defendant's amenability to correction, the Defendant's lack of criminal record, and the Defendant's physical health. The court considered the Defendant's social history a neutral factor, and we note the court's use of the Defendant's social history as a mitigating factor when deciding whether to grant probation.

The record contains evidence to support the court's denial of diversion. Although the court placed great emphasis on the circumstances of the offense, we note that the Defendant's mental health was also a point of particular concern for the court. The psychological evaluation reflects that although the evaluator did not diagnose the Defendant with a mental health issue, she noted that he exhibited hyper-vigilance relative to threats and disasters and a likelihood he felt responsible to help in times of crisis. The court considered the Defendant's behavior in the context of the Defendant's high intelligence and his decision to bring three loaded and concealed handguns onto a college campus on September 11. Given the court's concern with the Defendant's deliberate choice to bring three guns onto a campus in the context of the Defendant's hyper-vigilance, the court's denial of diversion was not illogical or unsupported by the record. The record does not reflect that the court abused its discretion. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE